UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DARRELL MILLER,

Petitioner,

v.

HEIDI M. LACKNER,

Respondent.

No. 2:15-cv-1056 KJM CKD P

FINDINGS AND RECOMMENDATIONS

Petitioner is a California prisoner proceeding through counsel with a petition for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner was convicted by a jury in Sacramento County of second degree murder based upon a theory of aiding and abetting. The jury also made a "special finding" regarding firearm use which resulted in petitioner's sentence being enhanced by one year; petitioner is serving an aggregate sentence of 21 years-to-life imprisonment. Petitioner's only claim is that the evidence presented at trial is not constitutionally sufficient to support his conviction. For the reasons set forth below, the court recommends that the petition for writ of habeas corpus be denied.

I. Background

In an unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

Accused of aiding and abetting his putative stepfather's shooting of a Crip gang member, defense counsel argued that not every criminal act by a gang member is gang related, and defendant Darrell Miller had no idea that his stepfather was going to fire at three people walking down the street. The jury did not find him guilty of the alleged gang enhancement, although he, his stepfather, and his good friend, who was also an occupant of the car at the time of the shooting, were all validated members of Blood gangs. On appeal, he contends there is insufficient evidence to support his conviction for second degree murder . . . . We disagree . . . and affirm the judgment.

. . . .

Eighteen-year-old defendant Darrell Miller grew up with the prosecution's key witness Tyvone Allen. They were best friends, like brothers. Codefendant Torrey Adams had been Miller's mother's boyfriend for many years. Defendant thought of Adams as his stepfather, although Adams proved to be a very poor role model. Adams sold drugs, carried weapons, committed gang-related assaults, and ultimately shot and killed the victim in this case, Antonne Nelms. A gang expert for the prosecution testified that defendant and Allen were validated members of the Oak Park Bloods; Adams also was a Blood gang member but belonged to a different clique.

The prosecution's theory that defendant aided and abetted the shooting is based on circumstantial evidence rooted in several events preceding the shooting that involved defendant. Indeed, the prosecutor argued that this case is all about defendant Miller. Defendant insisted it was all about codefendant Adams. Two separate juries were impaneled to hear the case against each of them.

Preliminarily, we must provide the relevant gang context. Before his untimely demise, Robert Haynes was also a member of the Oak Park Bloods. Defendant and Allen were close friends of Haynes. A member of the Barksdale family founded the G-Mobb gang, which does not claim either Blood or Crip affiliation and includes cliques such as Guttah Boyz and Starz. In 2008 several Oak Park Bloods, including Haynes, showed up at a G-Mobb party and a shootout ensued. One of the Barksdale brothers, a Guttah Boyz member, killed Haynes, and the killing sparked an increase in unprovoked violence between the two gangs. Defendant has a tattoo memorializing his friend.

On December 14, 2010, defendant went to a barbershop to get dreadlocks and ran into two old friends. He saw a man approach one of the barbers, and as the man pulled his pants up by the belt loops, defendant saw he had a gun. As another Barksdale brother, Marvion, approached, a gun battle erupted and defendant ran. Defendant was wounded and Barksdale was killed.

Six days later defendant and Allen planned to visit Haynes' grave site to commemorate his birthday. Adams arrived unexpectedly

and invited defendant and Allen to accompany him on a shopping errand. When they got into Adams' car, Adams gave his gun to defendant and defendant slipped it into his sling. At a shopping center in South Sacramento, Adams made a payment on a watch. Defendant then gave the gun back to Adams.

Adams drove to another shopping center in the middle of Starz territory and purchased an Astros baseball hat, a hat associated with the Starz gang. After leaving the shopping center, defendant pointed out a man he had been in a fight with a year earlier. The man, Eric Harris, was walking with his friends, Tushawn Cooks and the victim, Antonne Nelms. All three were Crips. Adams drove a little farther down the street, then abruptly backed into a gated driveway. Allen saw a police car drive by just before Adams opened fire on the trio. Nelms died at the scene.

Defendant would later describe his fight with Harris and its aftermath in some detail. "Yeah. We fought. Well look it was some stupid ass shit man. I'm at my girl house, um they – they used to live right downstairs from her, you feel me. I was livin with my bitch for a little bit. So me and her little brother on the balcony cuz we drinking some Hennessy up, passing it back and forth. They come – they come out and they like uh – like uh – he like – it was some weird, some little black ass dude they use to kick it wit, he was just running his mouth talking to my little brother. He like uh – he like yeah bitch as nigga, wasn't you the one that uh – woo – woo – woo. You know we can have words a minute though if I come up, come to the front so we can fight or some shit. It's three – the three of em and then it's two of us. I'm like nigga okay nigga, fuck you niggas, we not gonna come out there so y'all can man, whatever y'all gonna do. You know what I mean. So, look we wait til the morning. You wake me up, they go out, I go – I go downstairs for the – from the Slopes I go downstairs, they all outside, ah blah rah rah ah bla bla bla. So, I'm just watchin, I'm just watchin hard, ain't got nothing to do with y'all you feel me. I'm just watchin. So they – they – it was three of em against my little bro and my – and his big brother, they was gonna go try to jump him so I rushed the dude with the dreads, woo. I fight wit him, we start going back and forth and somehow uh he get on top of me and kicked me in my face and I hit my head on the ground, you feel me. So like a week – a week or two later them niggas copped a little pistol or something, you feel me. They copped a little gun, they – they was out there showing it off and shit. I don't know, I guess they got it for us. We – it wasn't – it wasn't no – we wasn't gonna take it that far, you feel me. It wasn't, fuck it we just fought, so what. But why – why we gotta go to gun play, you feel me. I told my big nigga like man, he heard about the shit. He heard the dude kicked me in my face and you know I was out for a little bit and he didn't like it. And that was that." (Transcript quoted verbatim.)

After the shooting [of Nelms], defendant borrowed Adams' car to drive to Haynes' grave site with Allen and defendant's twin sister. Allen testified the car smelled like gunpowder, but other than noticing the smell, they did not discuss the shooting. According to

Allen, who had entered into an agreement with the prosecution whereby his maximum 13-year sentence would be reduced to 5 years, defendant later told him, "Just don't talk about it," and sent him a text message that read, "Keep that shit in the car, bro."

Defendant, Adams, and Allen were arrested nearly two months later. Adams was in possession of 5.36 grams of cocaine, $3,500 in currency, and six cell phones. During extensive interrogations, defendant and Allen both told their interrogators that Adams was the shooter. The prosecution mined the transcripts of the interrogations for damming excerpts that defendant maintains were misleading because they were presented out of order and out of context. At a minimum, the transcripts are difficult to interpret because they are full of lies and obfuscations, spoken in a somewhat foreign vernacular. Suffice it to say, the jury could draw many reasonable inferences from what defendant, Adams, and Allen said to each other and to the interrogators.

For many hours, Adams denied defendant's and Allen's accusations that he was the shooter. At the same, he did not want to accuse either of them, which left him in a difficult situation. Ultimately, however, he admitted shooting at the three men but denied he intended to kill anyone. According to both Adams and defendant, the killing was accidental.

What everyone did agree upon, including the participants as well as the interrogators, was the painful fact that the killing was senseless. The transcripts simply do not provide any clarity as to why the victim was shot and killed. The prosecutor insisted that Adams, at defendant's urging, shot at the three men, including Harris, in retribution for the fight Harris had been in with defendant a year earlier. In the prosecutor's view the entire incident was gang related and part and parcel of the gang culture in which they participated. Even Adams, the prosecutor contended, denied that the shooting was totally random and resisted the notion that he was some monster who shot people for no reason at all. He stated, "[A]in't like, you know, we targeted them mother fuckers for any old reasons."

We know now, of course that the jury could not agree that defendant's conduct was gang related. Defendant points to other statements Adams made during the interrogations to suggest that Adams alone made the decision to shoot toward the group, including the man defendant had identified as someone he had fought a year earlier. Because the older Adams had a tortured past himself from his involvement in gangs, he was afraid the young "stepson" might have "the tendency maybe to do something." He explained, "I wanted to kind of like, not to say, take all your stripes. I didn't want 'ya all [*sic*] to go through that crap. I've been through it already." As the interrogator paraphrased Adams' statements, "[y]ou were protecting him from himself." Adams concurred. By then, Adams had confessed, and reflecting on the special relationship he had with defendant, he acknowledged that defendant did not have to take responsibility for the shooting because he had "man[ned] up" and taken responsibility himself. Adams expressed

> remorse and said to defendant Allen, "I hope y'all don't hold no ill will towards me."

People v. Miller, No. C071700, 2013 WL 6228649, at *1-3 (Cal. Ct. App, Dec. 2, 2013); Resp't's Lodged Doc. No. 6 at 1-6.

II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor,

> 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

III. Petitioner's Claim

A. State Court Decision

In the decision denying petitioner's sufficiency of the evidence claim, the California Court of Appeal reasoned as follows:

> The question thus posed is whether there is substantial circumstantial evidence to support the prosecution's theory that defendant aided and abetted the older Adams or whether the inferences the jury drew were based on "'suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.'" (*People v. Morris* (1988) 46 Cal.3d 1, 21, overruled on other grounds in *In re Sassounian* (1995) 9 Cal. 4th 535, 543, fn 5.)
>
> Defendant correctly points out "that in general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) An aider and abettor shares the perpetrator's specific intent "when he or she knows the full

extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Id.* at p. 560.)

Viewing the evidence in favor of the verdict, as we must, we agree with the prosecutor that defendant Darrell Miller is at the center of the case. The prosecutor presented substantial evidence that he had the motive to aid and abet the shooting since he had been involved in a fight with Harris, and Adams clearly shot in Harris's direction. Moreover, defendant might have been particularly agitated since people associating with the same people who had killed his good friend, whose birthday he planned to commemorate that very day, recently had shot him. Yet, he was compromised in his own ability to shoot because his arm remained in a sling.

Moreover, the prosecution also introduced evidence that the jury could reasonably infer constituted consciousness of guilt and the suppression of evidence. Defendant, together with Adams, instructed Allen not to talk to the police about the shooting, and he sent him a text message that could be interpreted to mean Allen should leave the gun in the car. He changed his clothing after he realized he smelled like gunshot residue. In short, the jury could infer that defendant aided and abetted the murder by holding the gun before the shooting, identifying the victim, providing the motive, and trying to conceal the weapon and convince Allen not to talk to law enforcement after the shooting.

That is not to say the evidence is compelling. Defendant raises credible arguments about the paucity of the evidence that he knew Adams planned to shoot at Harris and his friends, and that he shared his intent. There is no direct evidence that they had a conversation in the car preceding the shooting. It was not unusual for Adams to carry a gun, but there was no evidence he had ever shot anyone. There is no evidence in the transcripts of the interrogations that defendant, Adams, or Allen ever said anything that indicated Adams was planning to fire, or that defendant suggested that he should, or that a shooting was imminent. Simply put, the evidence in this case is entirely circumstantial. That does not mean however, that in viewing the evidence in the light most favorable to the prosecution we can say it is not substantial.

Moreover, the prosecution argued at some length that both Adams and Allen were minimizing defendant's involvement to protect him. After admitting to the shooting, Adams also conceded that he had treated defendant like a son and he did not want him to have to take responsibility for the shooting. Allen testified that he and defendant were like brothers. He placed all the blame on Adams, denying that there had been any discussion about the shooting before it happened. But the trial judge found that Allen had broken his promise to tell the truth and he nullified the agreement Allen had reached with the prosecution for a reduced sentence. Thus the jury could reasonably find they had reason to lie and disbelieve what they said, either to the interrogators or at trial.

/////

> As we said at the outset, defendant bears a heavy burden in demonstrating that the evidence is insufficient to support a jury verdict. We do not believe the jury based its verdict on mere speculation or conjecture rather than evidence. There is evidence, albeit circumstantial. Restricted as we are by the limited scope of appellate review, we cannot say that upon "'no hypothesis whatever is there sufficient substantial evidence to support [the [verdict]].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Thus, we must defer to the wisdom of the jury and affirm the judgment.

Miller, 2013 WL 6228649, at *4-5; Resp't's Lodged Doc. No 6 at 6-8.

B. Applicable Legal Principles

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). In other words, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).

Further, in conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and requires only that they "'draw reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 566 U.S. 650, 132 S. Ct. 2060, 2064 (2012) (per curiam) (citation omitted).

"'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). Under Jackson, the court need not find that the conclusion of guilt was compelled, only that it rationally could have been reached. Drayden v. White, 232 F.3d 704, 709-10 (9th Cir. 2000). Sufficiency

of the evidence claims in federal habeas proceedings must be measured with reference to substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. 324 n.16.

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). Additionally, as this case is subject to the provisions of 28 U.S.C. § 2254(d) as described above, this court owes a "'double dose of deference'" to the decision of the state court. Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011)). See also Coleman, 132 S. Ct. at 2062 ("Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."); Kyzar v. Ryan, 780 F.3d 940, 943 (9th Cir. 2015) (same).

C. Analysis

The premature death of Antonne Nelms is senseless and tragic; the facts and circumstances surrounding his death leave any rational person saddened by the sheer waste of human life. Similarly disturbing is the waste of petitioner's young life, sentenced at 18 years-old to twenty-one years-to-life in prison. Resp't's Lodged Doc. No. 1 at 11. However, the California Court of Appeal carefully reviewed the state law and the facts of the case, and concluded that the evidence is sufficient to support petitioner's conviction for the second degree murder of Nelms under an aiding and abetting theory. While the court has struggled, as the Court of Appeal did, with the senseless nature of the killing, the court must agree that there is sufficient evidence for the jury to have concluded that petitioner is guilty of second degree murder.

Indeed, a review of the record supports the Court of Appeal's observation that [petitioner] "Darrell Miller is at the center of the case." Miller, 2013 WL 6228649, at *4. The evidence presented by the prosecution allowed the jury to infer that petitioner aided and abetted the murder by "holding the gun before the shooting, identifying the victim, providing the motive, and in trying to conceal the weapon and convince Allen not to talk to law enforcement after the shooting." Id.

As the Court of Appeal noted, the most difficult question presented herein is whether sufficient evidence supports the finding that petitioner knew that it was Adams' intent to shoot at

Harris. On that point, the court recognizes that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." See Jackson, 443 U.S. at 326. Further, as the United States Supreme Court has instructed, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." Cavazos, 132 S.Ct. 2 at 4 (2011).

It is undisputed that immediately after petitioner identified Harris to Adams, Adams "abruptly backed into a gated driveway," allowing Adams a clear shot toward Harris and his friends. Miller, 2013 WL 6228649, at *2. It was at that point that Adams opened fire. Id. From this evidence, jurors were free to infer that Adams was aware of the details of petitioner's fight with Harris, including that Harris had kicked petitioner in the face and later brandished a gun in front of petitioner. Additionally, the jury was free to consider the absence of evidence that petitioner was surprised by Adams' actions, or that he protested or tried to stop Adams, who he knew was armed with a firearm, from shooting.

Finally, the court notes that the jury was equally entitled to credit, or not, the evidence of petitioner's close relationship with Adams, as well as the evidence of Adams' twisted motivation that he might prevent petitioner from coming to harm by resorting to violence himself.[1] The court admits that Adams' rationale merely underscores the senseless nature of this killing. Nonetheless, the evidence was presented, and the jury was entitled to give it the credence and weight it felt appropriate.

/////

[1] To reiterate the Court of Appeal's explanation, "[b]ecause the older Adams had a tortured past himself from his involvement in gangs, he was afraid the young 'stepson' might have 'the tendency maybe to do something.' He explained, 'I wanted to kind of like, not to say, take all your stripes. I didn't want 'ya all [*sic*] to go through that crap. I've been through it already.' As the interrogator paraphrased Adams' [sic] statements, '[y]ou were protecting him from himself.' Adams concurred. By then, Adams had confessed, and reflecting on the special relationship he had with defendant, he acknowledged that defendant did not have to take responsibility for the shooting because he had 'man[ned] up' and taken responsibility himself. Miller, 2013 WL 6228649, at *3.

IV. Conclusion

Considering all of the evidence presented to the jury, it was reasonable for jurors to infer petitioner's knowledge of Adams' intent, and petitioner's intent to aid and abet Adams' actions. The court's obligation to determine "'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt,'" Chein 373 F.3d at 982 (quoting Jackson, 443 U.S. at 318), has been satisfied and the court finds that there is sufficient evidence.

In any event, whether or not this court disagrees with the jury's conclusion that petitioner is guilty of second degree murder, the court finds that the Court of Appeal's rejection of petitioner's sufficiency of the evidence claim is not objectively unreasonable, thus precluding relief under 28 U.S.C. § 2254(d).

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: May 12, 2017

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

mill1056.157(6)